# Illinois Official Reports

## Appellate Court

---

### *Hiatt v. Western Plastics, Inc.*, 2014 IL App (2d) 140178

---

| | |
|---|---|
| Appellate Court Caption | MICHAEL HIATT, Plaintiff-Appellant, v. WESTERN PLASTICS, INC., NATIONAL RUBBER STAMP COMPANY, INC., NATIONAL RUBBER MACHINE, TRY-R-ELECTRIC COMPANY, CHINA NATIONAL RUBBER MACHINERY CORPORATION, GENERAL BINDING CORPORATION, AMERICAN C.N.C. MACHINE COMPANY, INC., and LEONARD HOFKAMP, Defendants (Illinois Tool Works, Inc., Defendant-Appellee). |
| District & No. | Second District<br>Docket No. 2-14-0178 |
| Filed | December 29, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from plaintiff's loss of his arms while cleaning an extruding machine wherein plaintiff sued his employer and several other defendants related to the machine, all but one of which had been dismissed or had entered into settlement agreements with plaintiff, the trial court erred in entering summary judgment for the remaining defendant, which operated one of its divisions next door to plaintiff's employer and sold products produced by plaintiff's employer based on the finding that it was not engaged in a joint venture with plaintiff's employer and owed no duty of care to plaintiff, since a genuine issue of material fact existed as to whether plaintiff's employer and the remaining defendant were engaged in a joint venture; therefore, the trial court's judgment was reversed and the cause was remanded for further proceedings. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 11-L-306; the Hon. Dorothy French Mallen, Judge, presiding. |

| | |
|---|---|
| Judgment | Reversed and remanded. |

| | |
|---|---|
| Counsel on Appeal | Devon C. Bruce, of Powers, Rogers & Smith, P.C., of Chicago, for appellant. |
| | J. Kent Mathewson, Karen Kies DeGrand, and Timothy L. Hogan, all of Donohue, Brown, Mathewson & Smyth LLC, of Chicago, for appellee. |

| | |
|---|---|
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justice Spence concurred in the judgment and opinion. Justice Burke dissented, with opinion. |

**OPINION**

¶ 1     Plaintiff, Michael Hiatt, was an employee of Western Plastics, Inc. (Western), which uses extruding machines to produce plastic sheets. The machines heat plastic pellets into a putty form and then push the material through metal rollers to create plastic sheets of desired thicknesses. On October 15, 2007, while cleaning one machine's spinning rollers, plaintiff's arms were crushed between the rollers and had to be amputated. Plaintiff sued Western and other defendants, all but one of which either have been dismissed or have entered into settlement agreements with plaintiff. The only remaining defendant, Illinois Tool Works, Inc. (ITW), operated one of its divisions next door to Western and sold products that Western produced. Plaintiff alleged that ITW was liable to him because it either (1) was engaged in a joint venture with Western, (2) retained control over Western, giving rise to a duty of care, or (3) had actual or constructive knowledge that the extruding machine was unreasonably dangerous. The trial court entered summary judgment in ITW's favor, finding that it was not engaged in a joint venture with Western and owed no duty of care to plaintiff. For the following reasons, we reverse and remand.

¶ 2                                I. BACKGROUND

¶ 3     Count IV of plaintiff's sixth amended complaint alleged as follows. ITW and Western were engaged in a joint venture to manufacture and sell plastic products. They shared profits and losses and exercised joint control and management of the manufacturing process, and they both contributed money, resources, equipment, and employees to the venture. ITW controlled the manner in which Western manufactured its products, including the pace and speed of the extruding machines. ITW knew that the extruding machine that injured plaintiff was unreasonably dangerous in that it lacked a proper emergency stopping mechanism and other safety devices. ITW was negligent individually and as a joint venturer with Western, in

that it allowed plaintiff to work on an unreasonably dangerous machine, failed to provide adequate warnings and instructions, failed to provide adequate safety devices, and failed to identify and correct safety hazards. ITW's acts or omissions proximately caused plaintiff's injuries.

¶ 4 ITW moved for summary judgment on count IV, contending that there was no genuine issue of material fact as to whether it was engaged in a joint venture with Western, retained control over the manufacturing process, or knew that the extruding machine that injured plaintiff was unreasonably dangerous. Rather than recite ITW's and plaintiff's arguments in support of and in opposition to summary judgment, which in essence are the same arguments they make on appeal, we summarize the deposition testimony and documentary evidence.

¶ 5 A. Don Edelstein's Deposition

¶ 6 Don Edelstein testified as follows. He had been part owner of Western since 1977, when he and three other individuals started the company. Originally, Edelstein worked as a machine operator at Western. In 1986 or 1987, his primary responsibility became machine maintenance, which remained his responsibility at the time of plaintiff's accident.

¶ 7 In 1999, Western built its third extruding machine, which was the machine that injured plaintiff. The machine was a clone of Western's other extruding machines. Western purchased the components for the machine from various entities, and Edelstein assembled the components, hiring an electrician and a welder for some of the work. At Edelstein's direction, the electrician, Leonard Hofkamp, installed an emergency stop cord on the machine exactly as the stop cords were installed on Western's other machines. Edelstein estimated that 95% of the plastic that Western produced on its third extruding machine was for ITW. However, ITW played no role in the design or construction of the machine. Other than plaintiff's, no injuries had occurred on the machine.

¶ 8 ITW was Western's biggest customer. At the time of the accident, ITW accounted for 70% to 80% of Western's business. Although ITW was headquartered elsewhere, it had a facility next door to Western, in the same building. ITW and Western were separated by a wall and shared a loading dock. Edelstein believed that ITW moved into the building to reduce shipping costs, because most of the material that it sold came from Western.

¶ 9 A written manufacturing agreement governed the relationship between Western and ITW. Broadly speaking, Western's intent upon entering into the agreement was to sell more products and increase profits. Western did not have written agreements with any of its other customers.

¶ 10 ITW supplied to Western the plastic pellets used to produce ITW's products. The pellets used a proprietary formula that ITW owned. In addition, ITW supplied some of the pallets used to ship its products and the labels to be placed on its products. The manufacturing agreement contained a formula for setting the price at which Western would sell products to ITW, based on the number of pounds of product manufactured. For customers other than ITW, Western supplied the raw material and the pallets. The price of products for customers other than ITW was based on the number of plastic sheets produced, not on weight.

¶ 11 Edelstein testified that ITW owned electronic monitoring devices that were installed on two of Western's extruding machines. The devices measured the thickness of the plastic sheets as they were produced. The devices were capable of controlling the speed of the

machines. When an extruding machine was set to "manual," the machine operator controlled the speed. When an extruding machine was set to "automatic," the monitoring device controlled the speed. When Western manufactured material for ITW, the machines were set to automatic. Although the monitoring devices were capable of controlling a machine's speed, ITW was unable to control the speed from its office. Instead, based on information that ITW provided, Western had programmed tolerances into the monitoring devices. The devices regulated each machine's speed to ensure that it produced material within the tolerances. For each roll of plastic produced, the monitoring devices also relayed the tolerances to ITW, which received a printout of the information. A wire from the devices ran through the wall into ITW's office. ITW incurred the expense of purchasing, installing, and maintaining the devices.

¶ 12 Upon further questioning, Edelstein clarified that there were two major components of each extruding machine–the portion "where the plastic is extruded" and the "downstream" portion, which contained the rollers that injured plaintiff. The monitoring devices were installed on and controlled the speed of the downstream portion of the machines. The speed of that portion affected the thickness of the plastic sheets being produced.

¶ 13 The monitoring device on the machine that injured plaintiff was not "activated" at the time of the accident, because the downstream portion of the machine had been separated from the extruder portion and plaintiff was standing between the two sections, cleaning the rollers on the downstream portion. When the two portions of the machine were separated, no material could move through the machine, and the monitoring device could not control the speed of the machine.

¶ 14 None of Western's other customers had monitoring devices installed on its machines like ITW did. However, like ITW, Western's other customers provided specifications for the thickness of the plastic sheets and rolls that they ordered.

¶ 15 Edelstein testified that Richard Pedersen worked as a "broker" for ITW and would enter Western on a daily basis to pick up completed orders. Pedersen did not have keys to Western. In addition to picking up completed orders, Pedersen helped with scheduling ITW's orders. Pedersen would create a schedule based on the thickness of the materials to be produced. The schedule ensured that Western did not "lose production," as Western could produce products with the same thickness at the same time. Other than Pedersen, ITW employees occasionally came to Western for other reasons, for instance, if there was a quality issue that needed to be addressed. This happened "maybe a half a dozen times over the years," possibly more.

¶ 16 B. Chris Benson's Deposition

¶ 17 Chris Benson testified as follows. He began working for ITW in 1986 in its Fastex division, which was located in Des Plaines, Illinois. In 1996, the Formex product line became part of the Fastex division. Formex is a flame-retardant polypropylene electrical insulation that is used in various electrical components. In 2000 or 2001, the Formex line was split off from the Fastex division and became a separate division of ITW. At that time, the Formex division moved into the space next to Western in Addison, Illinois. Western manufactured the Formex products.

¶ 18 Benson was responsible for, among other things, ordering raw material and issuing purchase orders to Western. When Benson issued a purchase order to Western, he identified

the products he was ordering by part number and specified a quantity. The manufacturing agreement between ITW and Western contained the specifications for each product. The specifications consisted of a desired thickness, the acceptable tolerances, and the acceptable quality. Tolerances referred to the acceptable range above and below the specified thickness. Quality was measured by counting the number of defects in a given roll of plastic sheet. Purchase orders were issued to Western approximately twice per month.

¶ 19     Benson testified that, between 2001 and 2007, he entered Western "[m]aybe a couple times a year." He did not have a key to Western. He would go there if there was a question about manufacturing or quality. For example, if Western wanted ITW's approval for a certain "surface appearance" of a product, Benson would go to Western to view the product.

¶ 20     Benson testified that Pedersen was an independent salesperson who introduced ITW to Western in approximately 1992. In 2000, Pedersen began working as an independent contractor for ITW, handling shipping and quality control. In that role, Pedersen worked 40 hours per week. He had a desk and a phone in ITW's office. His duties included delivering ITW's purchase orders to Western, helping Western determine a production schedule for ITW's orders, and picking up the finished products from Western using a forklift. He transported the finished products to ITW's warehouse, where they would be loaded onto trucks and shipped to customers. When Pedersen did these tasks, he was acting on ITW's behalf.

¶ 21     When asked about which costs ITW was responsible for with respect to products that Western manufactured for ITW, Benson testified that ITW purchased the raw material, the labels, and approximately 10% of the pallets used to ship the finished products. ITW supplied a portion of the pallets because they were of a size that Western did not have available. In addition, on two or three occasions, ITW contributed funds toward refinishing the rollers on the extruding machines used to produce ITW's products. The refinished rollers ensured that ITW products had a consistent thickness. On one occasion, ITW incurred the cost of new rollers.

¶ 22     Benson testified that Western was not the only company manufacturing products for ITW's Formex division. A company called Film Tech produced a thin-gauge plastic for ITW that Western was not capable of producing. However, between 2001 and 2007, Western produced approximately 95% of the products that ITW's Formex division sold.

¶ 23     Addressing the manufacturing agreement between ITW and Western, Benson testified that it was entered into "to explain the way we would carry on our business dealings with each other." When asked how many times ITW had instructed Western to make changes to the manufacturing process, as the agreement authorized it to do, Benson testified, "Rarely, if it all." However, Benson testified that ITW "frequently" exercised its right under the agreement to inspect the finished products at Western prior to receipt, which it did through Pedersen. Benson explained that, if Pedersen observed a defect in a sheet of plastic coming out of an extruding machine, Pedersen had "the right to tell the operator something need[ed] to be done." It then fell within the operator's discretion to remediate the problem. Benson estimated that this happened "rarely," which meant "[m]aybe monthly."

¶ 24     Benson testified that the monitoring devices were installed on Western's extruding machines "[p]rimarily for data acquisition for quality control purposes." Benson clarified that there were two types of monitors. The monitors attached to the machines constantly monitored the thickness of the plastic being manufactured. These monitors controlled the

speed of each machine to ensure that the plastic was being produced at the proper thickness. The monitor in ITW's office, which was connected to the monitors on the machines, solely acquired data. For each roll of plastic produced, the monitor in ITW's office acquired the roll number, the part number, the length of the roll, the thickness of the plastic, and the date and time of production. No one monitored the data as it was received; it was stored for record-keeping purposes. Explaining the benefit of the monitors, Benson testified that ITW received a consistent product, which increased ITW's sales and which, by virtue of ITW's agreement with Western, increased Western's sales.

### C. Lawrence Lezon's Deposition

¶ 26      Lawrence Lezon testified that he worked for ITW from 1986 to 2006 and was the general manager of the Formex division. The Formex division moved into the space next to Western in 1999 or 2000 because it needed an office and a warehouse. The advantage of locating next door to Western was that ITW did not have to truck the finished products to a different location.

¶ 27      Lezon testified that Pedersen was not an ITW employee but that he had an office in ITW's facility. Pedersen acted as a "one-person shipping department" for ITW. He also acted "as the go-between" for ITW and Western and delivered orders to Western.

¶ 28      Lezon recalled that Pedersen introduced him to Ray Howard at Western prior to 1993. Lezon knew Pedersen because Pedersen had worked for one of ITW's suppliers. However, that supplier was not producing ITW's products to its specifications. Pedersen left that supplier and became an independent sales representative. Pedersen told Lezon that he thought Western was capable of manufacturing ITW's products, and he and Lezon toured Western's facility. In 1993, Lezon and Howard negotiated the manufacturing agreement, using attorneys. Lezon would go to Western "maybe once a month," usually for "smoozing [*sic*]" with Howard.

¶ 29      Lezon testified that ITW requested that the monitoring devices be installed on Western's machines because ITW was receiving complaints from its customers regarding thickness variations within each roll of plastic. ITW had customers around the world, so it was expensive for orders to be returned. The devices ensured that the products had a consistent thickness.

### D. Pedersen's Deposition

¶ 31      Pedersen testified that he held a variety of positions in the plastics industry prior to 1989, at which time he became an independent salesperson. His company was called Quest Sales and Marketing, and Pedersen was its only employee. Through his company, Pedersen matched up customers with plastics manufacturers. Western was the only customer Pedersen and his company had remaining. He never had a written agreement with Western, but he did receive a sales commission from Western based on the number of pounds of product produced.

¶ 32      Pedersen had been familiar with ITW since 1988. In 1990 or 1991, he began looking for a custom extruder capable of producing material for ITW. He met Howard at Western and then introduced him to ITW. Once Western began manufacturing ITW's products, Pedersen's role was "the representative go-between between the two companies." He would communicate

ITW's production needs to Western, get "those to Western *** so that they could set up the production," and then transport the finished products back to ITW. He also performed quality control by checking samples from each roll of plastic for proper thickness and for imperfections. He shipped the finished products to customers from ITW's facility.

¶ 33  Pedersen had acted as the "go-between" since 1991, and ITW paid him as an independent contractor. Pedersen had an office at ITW, with a computer and a phone. He did not pay rent or a phone bill. He was present at ITW five days per week from 7 a.m. to 3:30 p.m.

¶ 34  Pedersen was in Western's facility on a daily basis. He did not have a key and usually would enter through the loading dock that ITW and Western shared. When he found imperfections in a finished product, he would voice his concerns to someone at Western, who would then remediate the problem. Depending on what the problem was, Western might have to stop an extruding machine or adjust the machine. However, Western would determine what was necessary to correct the problem. Pedersen would not direct Western to shut down a machine. In the past, Pedersen had entered specifications into ITW's monitoring devices. He did so only if a Western employee "had problems" with a device.

¶ 35  Pedersen had witnessed Western's employees cleaning the extruding machines. He knew that they would clean the rollers with a solvent while the rollers were slowly turning. Pedersen was not familiar enough with the machines to know what safety devices were available to stop a machine if someone was injured during the cleaning process. He stayed away from the machines as much as he could because they scared him. During his time working in the plastics industry, he had "seen too many people get hurt."

¶ 36  Pedersen testified that, on a number of occasions over the years, ITW had agreed to incur the cost of overtime hours for Western workers when ITW had large orders that needed to be completed. In those situations, Western would send ITW an invoice for the extra cost.

### E. Lauren Lavalle's Deposition

¶ 38  Lauren Lavalle testified that she had worked as a secretary at Western since 1980. Her responsibilities included accounts receivable, accounts payable, and office duties. She saw Pedersen on a daily basis, when he brought her ITW's orders. When he delivered orders, he would give her labels in the order in which he wanted the products produced. Lavelle would then create a production sheet, which was given to the machine operators. The production sheet allowed the operators to produce the products without having to make time-consuming changes to the machines. Lavalle had seen Benson approximately 10 times in 20 years. Other than ITW, which was "by far" Western's largest customer, Western had approximately 8 to 10 customers.

### F. Robert Cobb's Deposition

¶ 40  Robert Cobb testified that he had been a machine operator at Western since 1985. He saw Benson only "[o]nce in a great while" but he saw Pedersen every day. Pedersen was "there just like another employee." Pedersen placed orders for ITW and gave the orders to Lavalle, not directly to Cobb. The orders sometimes changed two or three times per day, and Cobb would have to adjust the size or the gauge of the plastic he was producing. When he changed the product he was producing, he would select the code for that product in ITW's monitor attached to the machine. No one from ITW operated the monitors.

¶ 41      Cobb testified that the Formex product left buildup on the rollers that had to be cleaned off on a daily basis. To clean the rollers, Cobb would use a rag to wipe them down while they were spinning. When product was not running through the machine, Cobb would slow down the rollers and reverse their direction before cleaning them. When product was running through the machine, Cobb would clean them from the opposite side. Other than plaintiff's, Cobb was not aware of any serious workplace injuries at Western. Cobb had not received any training when he started working for Western, because he had been fully trained at his prior job, which required him to operate the same kind of extruding machine.

¶ 42                            G. Timothy Smith's Deposition

¶ 43      Timothy Smith testified that he had worked as a machine operator at Western since 1983. Harold Howard, who was Smith's cousin, trained Smith and the other employees how to operate and clean the machines. There were no written instructions or manuals. On Monday mornings, the machine operators had to deep clean the rollers, which took about 10 minutes. Plaintiff was cleaning the rollers on a Monday morning when he was injured.

¶ 44      Approximately one week before the accident, Smith observed plaintiff cleaning the rollers while they "were running super fast" in the direction "to pull you in." Smith "yelled at him," slowed down the rollers, and put them in reverse. He told plaintiff that he would get plaintiff fired if he cleaned the rollers that way again. On the morning of the accident, after plaintiff's arms had been pulled into the machine, Smith saw that the speed dial was set on 790, which was "very fast." The speed dial should have been set on 200 or 300, which was "very slow." Smith had never observed anyone else cleaning the rollers while they were set at such a high speed.

¶ 45      Smith testified that, each time a machine operator started a new roll of plastic, he would push a button on the ITW monitoring device. When the roll was finished, the operator pushed the button again, and the device would print out a report indicating the length and thickness of the roll. Smith explained that the device controlled the speed of the rollers only when it was turned on and when material was running through the machine. Because no material was running through the machine when plaintiff was injured, the monitoring device could not have controlled the speed of the rollers.

¶ 46                            H. Harold Howard's Deposition

¶ 47      Harold Howard testified that he had worked at Western since 1978 and was its production manager, responsible for quality, scheduling, and supervising the machine operators. He alone trained plaintiff on how to clean the rollers. He instructed plaintiff to slow the rollers down to "two or three or until their [*sic*] barely moving." However, he did not instruct plaintiff to reverse the spin of the rollers prior to cleaning them. Harold trained all of the employees in the same manner. Ray Howard, who was Harold's uncle, trained Harold on how to clean the machines.

¶ 48                            I. Plaintiff's Deposition

¶ 49      Plaintiff testified that he worked at Western from 2003 or 2004 until the date of his accident, except for being laid off for six months due to a lack of business. He described his position as "helper" or "laborer." He would do the tasks Harold told him to do, such as filling

the hopper with plastic pellets, cleaning the rollers, or taking finished rolls off of the machine. Most of the training he received was from Harold, including on how to clean the rollers. Some instruction came from Ray Howard. However, there was no written instruction at all. Harold instructed him to stand in front of the rollers and to wipe back and forth with a rag dipped in solvent while the rollers were spinning in a forward direction. No one instructed him regarding the speed at which the rollers should be spinning or told him to slow down the rollers.

¶ 50 Plaintiff testified that he was injured on machine number one, which produced exclusively ITW's products. The rollers on machine number one had to be cleaned four to five times per eight-hour shift, because the Formex product would build up on the rollers. The rollers on machine number two, which produced a different plastic, did not necessarily have to be cleaned during each shift, because the product did not build up. When his accident occurred, at approximately 7:45 a.m. on a Monday, plaintiff was cleaning the rollers on machine number one before it had started producing any material. Plaintiff did not adjust the speed dial prior to cleaning the machine. He would touch the speed dial only when someone instructed him to do so.

¶ 51                            J. Manufacturing Agreement

¶ 52 The manufacturing agreement between ITW and Western was dated March 5, 1993, and was signed by Lezon of ITW and Ray Howard of Western. Western agreed to accept and fill orders from ITW for flame-retardant thermoplastic sheets and to fill those orders pursuant to ITW's specifications and quality control standards. The products and their specifications were listed in an exhibit attached to the agreement. Western agreed to have the capacity to produce a maximum of 800,000 pounds of sheet products annually. Western further agreed to sell the products to ITW at a price calculated pursuant to a formula designated in the agreement. The agreement required ITW to provide Western with a "shipment forecast" no later than the fifteenth of each month, to allow Western to plan production levels.

¶ 53 The agreement prohibited Western from selling ITW's products to anyone other than ITW. Western also had to return to ITW any scraps generated in the manufacturing process or dispose of them per ITW's instructions. ITW could require Western's employees to sign confidentiality agreements with respect to ITW's products.

¶ 54 The agreement provided, "For purposes of quality control Western agrees that changes to the manufacturing process must receive prior approval of ITW." It further provided that "[s]ubstitution of parts, raw materials, process equipment, or other items must be approved by ITW." ITW also had the authority to inspect the finished products at Western at any reasonable time. Western was required to "cooperate with ITW's designated representative(s) in performing such inspections and [to] make any improvements or changes reasonably requested by the representative(s)." Any requested changes would be at ITW's expense.

¶ 55 A section of the agreement entitled "Cost Improvement" provided that Western and ITW agreed "to work together to implement cost improvements in processes (excluding the cost of raw material) and overhead." ITW retained the right to approve any improvement "directly affecting the Product." The parties agreed to share equally "the benefits of cost improvements" and provided a specific formula:

"Western and ITW agree to share the benefits of cost improvements as follows:

> Western initiated:
>> 50% to Western/50% to ITW
>
> ITW initiated:
>> 50% to Western/50% to ITW."

The "Technology, Designs, Confidentiality" section provided that ITW would "work with Western to develop new designs or Products" and may "accept for use *** designs which are initiated by Western." Western agreed that it could not use the resulting designs "for any purpose other than manufacture of Products for ITW."

¶ 56 A section entitled "Independent Contractor" provided that neither party was "the agent of the other for any purpose whatsoever." In addition, it prohibited each party from binding or attempting to bind the other party to any contract or obligation with a third party. It provided that "[a]ll sales under this Agreement are and shall be between a principal seller and a principal buyer."

¶ 57 The agreement also contained an automatic renewal provision. It provided that the agreement would renew automatically for successive periods of one year, unless "written notice to the contrary" was received at least 60 days prior to the completion of the current term.

¶ 58 K. Miscellaneous Correspondence

¶ 59 In opposition to ITW's summary judgment motion, plaintiff submitted a variety of correspondence between ITW and Western. In a letter dated September 18, 1992, Benson wrote to Ray Howard that he was "pleased" that Western had agreed to "attempt a trial run" of ITW's products. Benson wrote that ITW "look[ed] forward to building a mutually beneficial relationship with Western." On May 23, 1994, which preceded ITW's move into the space next to Western, Benson wrote to Howard that he was "pleased to acknowledge Western Plastics as a warehousing facility" for "storage of various finished goods." He wrote that "this type of arrangement helps enable Fastex to function with Western Plastics as a true extension of our business." In correspondence dated November 1, 1994, Benson wrote to Howard about upcoming trial runs of new products. He wrote that "[w]e are sure there will be mutual benefits for all of us from this type of activity." On February 15, 1995, Benson wrote to Howard regarding the tolerances for various Formex products, and stated that the results of Western's efforts "pleased [ITW's] customers assuring continued growth for both Fastex and Western."

¶ 60 Some of the letters pertained to sharing the cost of the rollers. In a letter dated January 26, 1995, Benson wrote to Howard to authorize Western to "have one casting roll reworked" and to charge ITW using a "surcharge" of $0.25 per pound on the next 12,000 pounds of material produced. On June 18, 1997, Benson wrote to Howard that ITW agreed to pay $18,000 for the construction of two new rollers to be used for Formex products, while Western agreed to pay for all maintenance of the rollers. Benson acknowledged that Western would benefit by saving "a great deal of time on set-ups" and by "substantially reduc[ing] the number of roll changes required." He wrote that ITW would benefit through "improved gauge control" and "more economic use of raw material." He further wrote that "[t]hese benefits will be applied in consideration to cost savings for both parties according to section 15 of the contract," the "Cost Improvement" section.

On January 8, 2014, the trial court granted ITW's motion for summary judgment. The court found that there were no genuine issues of material fact as to at least three of the elements required for a joint venture, meaning that ITW was entitled to judgment as a matter of law on that issue. The court found that the "easiest element to analyze [was] whether there was a sharing of profit and losses." To that end, it found that there was no evidence that ITW and Western "got together at the end of [the] fiscal year *** and did a joint accounting and divided *** the profits or losses." It further found that "cost improvements" impacted profits and losses but were not profits or losses themselves. The court also found that there was no agreement to carry on a single enterprise. The court described the manufacturing agreement as a "typical" one between a manufacturer and a buyer. It also found that ITW's control over production was limited to "the specifications." The court found that there was evidence of a community of interest between ITW and Western, but that this was insufficient to give rise to a joint venture.

Next, the court found that there was no genuine issue of material fact as to the issue of retained control. The court found that ITW retained no control over the manner or method in which its products were produced, as long as its specifications were met. In addition, ITW retained no control over safety or how the machines were cleaned.

Addressing the issue of ITW's knowledge that the extruding machine was unreasonably dangerous, the court ruled that, even if it had such knowledge, it did not owe a duty of care to plaintiff. The court found that there was no evidence that ITW had "a right or authority" to instruct Western on how to train its employees or clean the machines.

Finally, the court found that, even if ITW were engaged in a joint venture with Western, the exclusive-remedy provision of the Workers' Compensation Act (820 ILCS 305/5(a) (West 2012)) would prohibit recovery against ITW as Western's co-venturer.

## II. ANALYSIS

On appeal, plaintiff argues that three genuine issues of material fact made summary judgment in ITW's favor improper: (1) whether ITW and Western were engaged in a joint venture, (2) whether ITW retained control over Western, giving rise to a duty of care to plaintiff, and (3) whether ITW's actual or constructive knowledge that the extruding machine was unreasonably dangerous gave rise to a duty to plaintiff. He also contends that the court erred in *sua sponte* ruling that, if ITW were engaged in a joint venture with Western, the exclusive remedy provision of the Workers' Compensation Act would immunize ITW from liability.

Summary judgment is appropriate where the pleadings, affidavits, depositions, and admissions on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011). "Summary judgment is a drastic means of resolving litigation and should be allowed only when the right of the moving party is clear and free from doubt." (Internal quotation marks omitted.) *Sedlacek v. Belmonte Properties, LLC*, 2014 IL App (2d) 130969, ¶ 12. We review *de novo* an order granting summary judgment. *Thompson*, 241 Ill. 2d at 438.

¶ 70    Plaintiff argues that there is a genuine issue of material fact as to whether ITW and Western were engaged in a joint venture. He argues that through the manufacturing agreement and their conduct the parties expressed their intent to carry on an enterprise. He contends that ITW and Western shared profits and losses, as the goal of the joint venture was to increase the parties' profits, and that the parties shared the costs of the manufacturing process. He further argues that there was a community of interest, as reflected in ITW's contributions of money, equipment, effort, and skill to the enterprise. Finally, plaintiff argues, ITW and Western both enjoyed the right to control and manage the operation, as evidenced by the agreement and their conduct.

¶ 71    ITW responds that the manufacturing agreement established the parties' relationship as one of buyer and seller and that it would be improper to infer any contrary intent from their conduct. ITW further argues that it did not share profits and losses with Western; rather, both parties independently profited from their contractual relationship, and the sharing of costs is not synonymous with the sharing of losses. Regarding the right to control and manage the manufacturing operation, ITW argues that requiring that its product specifications be met is different from controlling and managing the production process.

¶ 72    A joint venture is an association of two or more persons to carry out a single enterprise for profit. *Fitchie v. Yurko*, 212 Ill. App. 3d 216, 226 (1991). Similar to partners in a partnership, members of a joint venture are vicariously liable for fellow venturers' negligent acts committed during the course of the enterprise. *Barton v. Evanston Hospital*, 159 Ill. App. 3d 970, 973 (1987); *Stone v. Guthrie*, 14 Ill. App. 2d 137, 147 (1957). Ordinarily, the existence of a joint venture is a question of fact for the trier of fact. *O'Brien v. Cacciatore*, 227 Ill. App. 3d 836, 843 (1992).

¶ 73    No formal agreement is necessary to form a joint venture, which can be inferred from the parties' conduct and the facts and circumstances of a given case. *Electrical Contractors, Inc. v. Goldberg & O'Brien Electric Co.*, 29 Ill. App. 3d 819, 822 (1975). A joint venture is a creation of contract law (*Public Electric Construction Co. v. Hi-Way Electric Co.*, 62 Ill. App. 3d 528, 531 (1978)), and whether one exists is a question of the parties' intent. *Fitchie*, 212 Ill. App. 3d at 227. In evaluating that intent, courts look to the following elements: (1) an express or implied agreement to carry on an enterprise; (2) a demonstration of intent to be joint venturers; (3) a community of interest, as reflected in the contribution of property, money, effort, skill, or knowledge; (4) a measure of joint control and management of the enterprise; and (5) sharing of profits and losses. *Fitchie*, 212 Ill. App. 3d at 227. In the absence of any one of these elements, no joint venture exists. *O'Brien*, 227 Ill. App. 3d at 843.

¶ 74    1. Agreement to Carry on an Enterprise and Demonstration of Intent to be Joint Venturers

¶ 75    Plaintiff contends that the manufacturing agreement between ITW and Western is an agreement to carry on a single enterprise producing plastic sheets. He maintains that, despite the agreement's "Independent Contractor" provision, the agreement is not a simple contract between a buyer and a seller. He argues that the agreement's unique provisions and the

parties' conduct create a genuine issue of material fact as to whether ITW and Western agreed to carry on an enterprise and demonstrated an intent to be joint venturers.

¶ 76    ITW responds that the agreement's "Independent Contractor" provision is controlling. ITW maintains that, because a joint venture is a creature of contract law, it would be error to interpret the parties' agreement in a manner contrary to one of its unambiguous provisions. In other words, ITW argues that, because it agreed with Western that their relationship was one between a principal buyer and a principal seller, a trier of fact could not infer that they agreed to carry on an enterprise or demonstrated an intent to be joint venturers.

¶ 77    "Courts look to the substance and not to the form to determine whether there is a joint venture with the most important element being the intention of the parties." *Petry v. Chicago Title & Trust Co.*, 51 Ill. App. 3d 1053, 1057 (1977). "A joint venture is not a status created or imposed by law, but is a relationship voluntarily assumed and arising wholly *ex contractu*; the relationship is a matter of intent as between the parties." *Public Electric Construction Co.*, 62 Ill. App. 3d at 531. Courts determine the parties' intent "in accordance with the ordinary rules governing the interpretation and construction of contracts." *Carroll v. Caldwell*, 12 Ill. 2d 487, 497 (1957). "A joint venture agreement need not expressly state that such was intended ***." *United Nuclear Corp. v. Energy Conversion Devices, Inc.*, 110 Ill. App. 3d 88, 110 (1982).

¶ 78    In *Public Electric Construction Co.*, on which ITW relies, the plaintiff and the defendant orally agreed to perform electrical work together on a construction project. They agreed that the plaintiff would provide labor, the defendant would provide material, and the parties would share equally the profits or losses. After work on the project began, the parties reduced their agreement to writing, designating the defendant as a subcontractor and the plaintiff as a sub-subcontractor. The agreement provided: " 'It is understood and agreed by and between the parties that this Agreement is not contemplated to form any association, partnership or joint venture agreement between the parties hereto. The parties will continue to be subcontractor and sub-subcontractor, respectively.' " *Public Electric Construction Co.*, 62 Ill. App. 3d at 530. Following a bench trial, the trial court found that no joint venture existed between the parties. *Public Electric Construction Co.*, 62 Ill. App. 3d at 529-31.

¶ 79    The appellate court affirmed, reasoning that the record was clear that the parties did not intend to enter into a joint venture. The court stated that "the contract as executed explicitly reject[ed] the existence of any joint venture." *Public Electric Construction Co.*, 62 Ill. App. 3d at 531. The court further reasoned that, because the parties' intent could be "easily ascertained" from the contract language, no further contract construction was necessary. *Public Electric Construction Co.*, 62 Ill. App. 3d at 531-32.

¶ 80    Here, the parties' intent is not so easily ascertained from the manufacturing agreement. The "Independent Contractor" provision states that ITW and Western agree that neither is the agent of the other. According to ITW, this suggests an intent not to be joint venturers, because, like partners in a partnership, co-venturers in a joint venture are agents of each other. *Ioerger v. Halverson Construction Co.*, 232 Ill. 2d 196, 202 (2008). However, unlike the agreement in *Public Electric Construction Co.*, the agreement here does not explicitly state that the parties are not engaged in a joint venture. This is critical, because "the declaration of the parties is not controlling where the conduct of the parties demonstrates the existence of an agency relationship." *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127, 134 (2007). In other words, even if two parties expressly disclaim an agency

- 13 -

relationship, a trier of fact nevertheless may find that one exists, based on the parties' conduct. *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 75 (2008). Therefore, contrary to ITW's argument, the agreement's "Independent Contractor" provision is not determinative of whether a joint venture existed.

¶ 81        Additionally, the agreement contains a number of other provisions that, when viewed in the light most favorable to plaintiff, could evince an intent to carry on an enterprise and to be joint venturers. Significantly, the agreement provided that ITW and Western would work together to design new products and to improve the production process. The "Cost Improvement" section provided that Western and ITW agreed to "work together to implement cost improvements in processes *** and overhead" and to share equally the benefits of those cost improvements. Similarly, the "Technology, Designs, Confidentiality" section provided that ITW would "work with Western to develop new designs or Products" and may "accept for use *** designs which are initiated by Western." Western agreed that it could not use the resulting designs "for any purpose other than manufacture of Products for ITW." These provisions contemplated ITW and Western working together to achieve improvements in the manufacturing process and in product designs. Based on these provisions, a trier of fact could conclude that the parties intended not a simple buyer-seller arrangement, but a joint venture, the goal of which was to develop an efficient and profitable manufacturing operation.

¶ 82        Similarly, pursuant to the "Inspections and Warranty" section of the agreement, ITW retained the right to approve all changes to the manufacturing process, including substitution of parts, raw materials, process equipment, "or other items." ITW also had the right to inspect the finished products prior to receipt, "at any reasonable time," and Western was required to make "any improvements or changes" that ITW reasonably requested as the result of its inspections. Viewed in the light most favorable to plaintiff, these provisions at least suggest an intent to carry on a jointly controlled manufacturing enterprise.

¶ 83        Furthermore, the relationship outlined in the manufacturing agreement was such that neither party could benefit from the arrangement at the expense of the other. Western agreed not to "manufacture, process for or sell to any purchasers other than ITW items similar in specification or design" to the products it manufactured for ITW. In addition, the price at which Western sold the products to ITW was fixed according to a formula outlined in the agreement. Any cost improvements achieved in processes or overhead had to be shared equally between the parties. Thus, Western had no ability to increase its profit at ITW's expense. Rather, Western had to sell all of the Formex products it produced to ITW at a predetermined price, and it could not reduce its costs without sharing the benefits of those cost improvements with ITW. Again, a trier of fact could conclude that ITW and Western did not intend an ordinary buyer-seller relationship.

¶ 84        Finally, the agreement contemplated a long-term relationship that, when viewed in light of the agreement's other provisions, at least suggests the existence of a joint manufacturing enterprise. The agreement provided that it would automatically renew each year, except upon 60 days' written notice to the contrary. It also provided that Western agreed to manufacture and sell products to ITW in the quantities and pursuant to the schedule "set forth in a yearly blanket purchase order from ITW." The agreement also required that Western maintain the capacity to produce 800,000 pounds of sheet products annually.

¶ 85    Not only do the unique provisions of the manufacturing agreement create a genuine issue of material fact as to the parties' intent to carry on an enterprise and to be joint venturers, but also the parties' conduct subsequent to the execution of the agreement creates an issue of fact on this issue. Among that conduct was (1) Benson's May 23, 1994, letter to Ray Howard acknowledging Western as a "warehousing facility" for ITW's finished goods and noting that "this type of arrangement helps enable Fastex to function with Western Plastics as a true extension of our business"; (2) ITW's installation of the electronic monitoring devices on Western's extruding machines; (3) ITW's purchase of new rollers for one of Western's extruding machines; and (4) ITW's payment for the overtime hours of Western employees when large orders needed to be filled and overtime work was required. Although none of this evidence is conclusive of the parties' intent to carry on an enterprise or to be joint venturers, when viewed in the light most favorable to plaintiff it creates a genuine issue of material fact as to these issues.

¶ 86                                        2. Community of Interest

¶ 87    The trial court found that there was a genuine issue of material fact as to whether ITW and Western shared a community of interest, and we agree. A community of interest is established when the parties have both contributed property, finances, effort, skill, or knowledge to the joint venture. *Fitchie*, 212 Ill. App. 3d at 227. In *Fitchie*, a community of interest was found where one party purchased lottery tickets and two others expended their time and energy scratching the tickets. *Fitchie*, 212 Ill. App. 3d at 227.

¶ 88    Here, there is ample evidence that both ITW and Western made contributions to the manufacturing operation. The evidence revealed that ITW supplied the raw material plastic pellets, 10% of the shipping pallets, and the product labels. It also contributed funds toward the purchase and refurbishing of the rollers. Perhaps ITW's most significant contribution was the monitoring devices, which ITW owned and incurred the costs of purchasing, installing, and maintaining. The devices were integral parts of Western's extruding machines, controlling the speed of the rollers whenever the machines were producing ITW's products. Western contributed the extruding machines and the labor to operate the machines.

¶ 89                                    3. Joint Control and Management

¶ 90    The trial court found that the element of shared control and management was not present, because any control that ITW exerted was related to ensuring that its product specifications were met. Although we agree with the trial court that ITW's focus at least in part was its product specifications, we nevertheless believe that there is a genuine issue of material fact as to whether ITW "directed" or "governed" Western's conduct in achieving those specifications. See *Herst v. Chark*, 219 Ill. App. 3d 690, 696 (1991) (the element of shared control requires only "some right by the parties to direct and govern the conduct of each other in connection with the joint venture"); see also *Ambuul v. Swanson*, 162 Ill. App. 3d 1065, 1069 (1987) (reasoning that a joint venture does not require a co-venturer's participation in "the day-to-day management of the enterprise"). Moreover, ITW's focus in directing and governing Western's conduct was not only achieving its product specifications, but also achieving greater efficiency and cost savings.

¶ 91    Much of the evidence relevant to the issue of joint control revolved around Pedersen. Although not an employee of either ITW or Western, Pedersen acted as "go-between" for the two companies, performed a variety of tasks, and received compensation from both companies. ITW paid Pedersen as an independent contractor, while Western paid him a sales commission. Perhaps most significantly, Pedersen, while acting as ITW's representative, assisted in the scheduling of Western's production. This reduced the number of time-consuming adjustments to the extruding machines, resulting in efficiency that benefited both ITW and Western. Cobb testified that the production schedule would sometimes change two or three times per day and that Pedersen was "there just like another employee." A trier of fact could conclude that ITW, through Pedersen, exercised control over the manufacturing operation with the aim of making it more efficient and profitable for both ITW and Western.

¶ 92    Furthermore, as discussed above, the manufacturing agreement gave ITW the right to inspect the finished products prior to receipt, "at any reasonable time." Benson testified that ITW "frequently" exercised this right through Pedersen. According to Benson, Pedersen had "the right to tell the operator something need[ed] to be done." Pedersen testified that he did not direct Western on how to fix the defects he located, but he also testified that Western would remediate any problem he brought to its attention. Indeed, the manufacturing agreement required Western to make "any improvements or changes" that ITW reasonably requested as the result of its inspections. This is further evidence of the control that ITW exercised.

¶ 93    In addition, the electronic monitoring devices constitute evidence, at least to some degree, of ITW's control or management of the manufacturing operation. Although the deposition testimony indicated that Western controlled whether the monitoring devices were turned on or off, the testimony further indicated that the devices were turned on whenever the extruding machines were producing ITW's products. When turned on, the devices controlled the speed of the rollers, using preprogrammed specifications for ITW's products. Pedersen testified that he had at times entered specifications into the devices when Western "had problems" with them. At a minimum, that ITW owned these devices suggests that it was so deeply involved in the manufacturing operation that Western was not free to fill ITW's orders in any manner it saw fit. Rather, by purchasing, installing, and maintaining the devices, ITW made it such that Western could not produce ITW's products completely independently of ITW. Western's production became dependent upon an integral component that ITW contributed, owned, and maintained.

¶ 94                                    4. Shared Profits and Losses

¶ 95    The trial court found that the element of shared profits and losses was the "easiest element" to analyze. Most significant in the trial court's view was that there was no evidence that ITW and Western "got together at the end of [the] fiscal year *** and did a joint accounting and divided *** the profits or losses." Although we agree with the trial court that there was no evidence of joint accounting, we nevertheless conclude that there is a genuine issue of material fact as to whether the parties shared profits and losses.

¶ 96    Significantly, the parties have not cited, and our research has not uncovered, any Illinois case holding that, for the shared-profits element of a joint venture to be established, the parties must engage in joint accounting or "pool" their profits and losses prior to dividing

- 16 -

them. Rather, Illinois case law indicates that, as long as the parties share in the same revenue stream, the shared-profits element may be established. See *Herst*, 219 Ill. App. 3d at 695-96.

¶ 97    In *Herst*, the plaintiff and the defendant entered into an oral agreement to engage in the commercial debt collection business. The plaintiff was to sell the services to clients, and the defendant was to perform the debt collection. *Herst*, 219 Ill. App. 3d at 694-95. When the plaintiff sold the services to a client, the client would pay a refundable retainer deposit. *Herst*, 219 Ill. App. 3d at 694. The client then received a credit equal to 20% of the deposit toward the collection fees earned by the defendant when he fulfilled the services. *Herst*, 219 Ill. App. 3d at 694-95. The trial court found that the parties were engaged in a joint venture, and the appellate court affirmed. *Herst*, 219 Ill. App. 3d at 692-93.

¶ 98    Addressing the shared-profits element, the appellate court reasoned that the parties agreed to "divide the business along two function lines, marketing and fulfillment." *Herst*, 219 Ill. App. 3d at 695. The parties also divided the revenues and expenses along those same functional lines. *Herst*, 219 Ill. App. 3d at 695. Although the plaintiff did not share in the profits and losses of the defendant's business as a whole, "he nevertheless shared in that part of the profits and losses as between the parties with respect to particular clients serviced through the refundable retainer program set up by [the plaintiff]." *Herst*, 219 Ill. App. 3d at 695-96. The court concluded that the evidence was sufficient to establish that the parties were engaged in a joint venture, rather than "a principal/agent sales business." *Herst*, 219 Ill. App. 3d at 696.

¶ 99    Here, a trier of fact could conclude that, similar to the parties to the debt collection arrangement in *Herst*, the parties divided the manufacturing operation along functional lines and divided the revenues and expenses of the operation along those same lines. ITW owned the proprietary Formex formula and provided the raw material plastic pellets, 10% of the shipping pallets, and the product labels. Western owned the extruding machines and provided the labor and the remainder of the shipping pallets. Western's function was to run ITW's raw material through its extruding machines, using the monitoring devices that ITW contributed. Western then received a predetermined price for the finished products, based upon the number of pounds of product it produced. ITW's function was to perform quality control and to sell the finished products to customers. If ITW's sales volume increased or decreased, Western's revenue increased or decreased in the same proportion, since the revenue it received was based on the predetermined formula contained in the manufacturing agreement.

¶ 100    Further supporting a conclusion that the parties may have shared profits and losses is the consideration, already discussed above, that the terms of the manufacturing agreement made it such that neither party could profit at the expense of the other. Because Western was not free to manufacture, process, or sell the Formex plastic sheet products to anyone other than ITW, and because the price at which Western sold the products to ITW was calculated pursuant to a predetermined formula, Western could not increase its profits at ITW's expense. Instead, Western received a predetermined price, based on the formula in the agreement, for all of the products it manufactured for ITW. If Western sought to increase its profits by implementing "cost improvements," it had to share equally with ITW the benefits of those improvements. As a result, the parties were both interested in making the manufacturing operation more efficient, and they shared equally the financial benefits of any improvements in efficiency.

¶ 101    The dissent concludes that there is no genuine issue of material fact as to the shared-profits element. According to the dissent, what we have described as the sharing of profits and losses "would apply to any relationship between entirely independent companies engaged in the manufacture and distribution of a product." *Infra* ¶ 127. As our discussion shows, it is inaccurate to characterize the relationship between ITW and Western as one between "entirely independent companies." While it is difficult to provide a precise definition of their relationship, at a minimum ITW and Western had a long-term, closely intertwined relationship, in which they dealt nearly exclusively with each other, jointly contributed equipment and raw material, and worked together to implement mutually beneficial "cost improvements." These considerations distinguish this case from *Wells v. Whitaker*, 151 S.E.2d 422 (Va. 1966), cited by the dissent, which involved two companies with a much less intertwined relationship than that between ITW and Western. Given the unique facts of this case–including the requirement that Western share equally all "benefits of cost improvements" with ITW–we believe that it is for a jury to decide whether ITW and Western shared profits and losses.

¶ 102    In sum, we conclude that there is a genuine issue of material fact as to whether ITW and Western were engaged in a joint venture. We express no opinion on whether plaintiff will be able at trial to meet his burden of proving the existence of a joint venture. See *Yorkel v. Hite*, 348 Ill. App. 3d 703, 708 (2004) (noting that the party contending that a joint venture exists has the burden of proving such a relationship). We merely conclude that summary judgment was improper based on the record before us. Moreover, we express no opinion regarding whether the allegedly negligent acts that caused plaintiff's injury were committed during the course of the enterprise. See *Barton*, 159 Ill. App. 3d at 973 (noting that members of a joint venture are vicariously liable for the negligent acts of fellow venturers committed during the course of the enterprise). The parties have not addressed this issue, and we decline to address it *sua sponte*.

¶ 103                    B. Workers' Compensation Act's Exclusive-Remedy Provision

¶ 104    Plaintiff contends that the trial court erred in *sua sponte* ruling that, if ITW were engaged in a joint venture with Western, the exclusive-remedy provision of the Workers' Compensation Act (820 ILCS 305/5(a) (West 2012)) would immunize ITW from liability. He points out that the issue "had never before been raised by defense counsel." At oral argument, ITW conceded that it did not raise the issue below and that it was "raised purely by the court." Nevertheless, ITW contends that the provision provides an alternative basis to affirm the entry of summary judgment in its favor.

¶ 105    We agree with plaintiff that it was error for the trial court to raise this issue *sua sponte*. The exclusive-remedy provision is an affirmative defense and is forfeited if not timely raised. *Doyle v. Rhodes*, 101 Ill. 2d 1, 10 (1984); *Sobczak v. Flaska*, 302 Ill. App. 3d 916, 919 (1998). Whether to assert the exclusive-remedy provision as a defense can be a strategic decision, as a defendant "may choose not to raise it in the hope that the plaintiff will be unable to prove negligence to a jury's satisfaction," thus avoiding liability. *Doyle*, 101 Ill. 2d at 10. On the other hand, if a defendant raises the exclusive-remedy provision as a defense, it might subject itself to no-fault liability under the Workers' Compensation Act. See *Sharp v. Gallagher*, 95 Ill. 2d 322, 326 (1983) (explaining that, in exchange for the imposition of no-fault liability upon the employer, the Workers' Compensation Act prohibits common-law

suits against the employer). In *Sobczak*, the appellate court found that the defendant had not forfeited the defense of the exclusive-remedy provision where, although it did not plead it, it raised the defense in a summary-judgment motion and the plaintiff responded to the motion on the merits. *Sobczak*, 302 Ill. App. 3d at 920. The court reasoned that any forfeiture was "technical only" and that the plaintiff was not prejudiced by the defendant's failure to plead the defense. *Sobczak*, 302 Ill. App. 3d at 920.

¶ 106    Here, ITW concedes that it did not plead the exclusive-remedy provision as an affirmative defense or raise the issue in its motion for summary judgment. Instead, as plaintiff pointed out at oral argument, the parties engaged in more than five years of motion practice and discovery, taking more than 40 depositions, many of which focused on the issue of whether ITW and Western were engaged in a joint venture. Clearly, ITW made a strategic decision not to assert the exclusive-remedy provision as a defense, in the hope that it could avoid liability altogether by defeating plaintiff's tort claim. Nevertheless, at the hearing on ITW's summary-judgment motion, following the parties' lengthy arguments that did not discuss the exclusive-remedy provision, the trial court *sua sponte* raised the issue. This was error. See *In re Marriage of Drewitch*, 263 Ill. App. 3d 1088, 1093 (1994) ("A trial judge may not be an advocate for a party, *** but must take the case as the parties have presented it."). If ITW were permitted to raise the exclusive-remedy provision as a defense at this late stage, despite its earlier decision not to assert the defense, then plaintiff would be prejudiced.

¶ 107    We recognize the general rule that, "although a defense not raised in the trial court may not be raised for the first time on appeal by an appellant, 'the appellee may urge any point in support of the judgment on appeal, *** so long as the factual basis for such point was before the trial court.' " *Travelers Casualty & Surety Co. v. Bowman*, 229 Ill. 2d 461, 470-71 (2008) (quoting *Shaw v. Lorenz*, 42 Ill. 2d 246, 248 (1969)). However, "[w]hile an appellee is not as limited in the scope of review as is an appellant, nevertheless, the review cannot go beyond the issues appearing in the record." *Consoer, Townsend & Associates v. Addis*, 37 Ill. App. 2d 105, 110 (1962). "The issues are determined from the pleadings and the evidence." *Consoer, Townsend & Associates*, 37 Ill. App. 2d at 110. "[T]o permit a change of theory on review 'would not only greatly prejudice the opposing party but would also weaken our system of appellate jurisdiction.' " *Kravis v. Smith Marine, Inc.*, 60 Ill. 2d 141, 148 (1975) (quoting *In re Estate of Leichtenberg*, 7 Ill. 2d 545, 548-49 (1956)). Thus, an issue raised by an appellee for the first time on appeal "must at least be commensurate with the issues" presented in the trial court. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 509 (1988).

¶ 108    As we have said, ITW chose to litigate this case by defending against plaintiff's tort claim on the merits. Having made the strategic decision not to raise the affirmative defense of the exclusive-remedy provision, it cannot now change its theory on appeal.

¶ 109                                C. Right of Control

¶ 110    Plaintiff next argues that a genuine issue of material fact exists regarding whether ITW retained control over Western, giving rise to a duty of care. He relies on section 414 of the Restatement (Second) of Torts, which provides for liability against a party who retains less control over another than is necessary to give rise to a principal-agent relationship, but who nevertheless retains some control over the manner in which work is done. See Restatement

(Second) of Torts § 414 cmts. a, c (1965). Plaintiff contends that, even if Western was not ITW's agent, ITW at least retained control over the manner in which Western worked.

¶ 111    ITW responds that it retained no control over Western's safety practices and that any control it did retain was related to quality-control measures. It also posits that a higher degree of control than it exercised is legally required for a duty of care under section 414.

¶ 112    Generally, one who employs an independent contractor is not liable for the contractor's acts or omissions. *Wilfong v. L.J. Dodd Construction*, 401 Ill. App. 3d 1044, 1060 (2010). An exception to the rule is found in section 414 of the Restatement (Second) of Torts:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

As we noted above, liability under this section arises when a party retains less control than is necessary to give rise to a principal-agent relationship. Restatement (Second) of Torts § 414 cmt. a (1965). For the section to apply, the party "must have retained at least some degree of control over the manner in which the work is done," such that "the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c (1965).

¶ 113    Even assuming *arguendo* that ITW retained sufficient control over Western to invoke section 414, this does not mean that summary judgment in ITW's favor on this issue was improper. ITW argues that, because any control that it retained was unrelated to safety or to cleaning the rollers, it could not be held liable under section 414. We agree.

¶ 114    Under section 414, when an employer has retained control over the manner in which work is done, the employer "is subject to liability if he fails to prevent the [independent contractor] from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the [independent contractor's] work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself." Restatement (Second) of Torts § 414 cmt. b (1965); see *Schaughnessy v. Skender Construction Co.*, 342 Ill. App. 3d 730, 739 (2003) (declining liability under section 414 when the defendant did not see the plaintiff "engage in the unsafe practice that led to his injury or even had notice that plaintiff intended to engage in such conduct").

¶ 115    Here, there was no evidence that ITW retained any control over safety at Western or over the manner in which Western's employees cleaned the extruding machines. The manufacturing agreement did not impose on ITW the obligation to monitor safety at Western or grant it the authority to supervise Western employees while they were cleaning the machines. According to Smith, Harold trained each new employee, and there were no written instructions or manuals. Both Harold and plaintiff testified that Harold was the only one who trained plaintiff on how to clean the machines. Moreover, Edelstein testified that ITW played no role in the design or construction of the machine that injured plaintiff. The emergency stop cord, which was the only safety device on the machine, was installed by the electrician in accordance with Edelstein's instructions. Pedersen, who was present at Western far more often than any other representative of ITW, testified that he was not familiar enough with the machines to know what safety devices were available to stop a machine if someone were

injured. In sum, there was no evidence that ITW retained any control over safety at Western or over how or when the machines were cleaned.

¶ 116    Similarly, there was no evidence that ITW had any opportunity to prevent plaintiff's injuries or had notice that the machines were being cleaned in an unsafe manner. Smith testified that, when plaintiff's injuries occurred, the rollers were set at 790, which was "very fast," instead of at 200 or 300, which was "very slow." Although Smith testified that on one prior occasion he had observed plaintiff cleaning the rollers at that speed, there was no evidence that anyone from ITW had witnessed any Western employees cleaning the machines in an unsafe manner. Thus, there was no evidence that ITW either knew that the cleaning process was unsafe or had the opportunity to prevent plaintiff's accident.

¶ 117    Based on the foregoing, we conclude that summary judgment in ITW's favor on this issue was proper. There was no evidence that ITW retained control over safety at Western or over how Western's employees cleaned the extruding machines. Nor was there any evidence that ITW could have prevented plaintiff's injuries by exercising any control it retained.

¶ 118                              D. Unreasonably Dangerous Machine

¶ 119    Plaintiff finally contends that a genuine issue of material fact exists as to whether ITW owed him a duty of care arising out of its actual or constructive knowledge that the extruding machine was unreasonably dangerous. He relies on a single case, *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32 (2004), which involved a negligence claim against a natural-gas supplier. Plaintiff has not cited any case applying *Adams* outside of the natural-gas context.

¶ 120    In *Adams*, the issue was whether the defendant natural-gas supplier had a duty to warn its customers that a common brass connector was likely to corrode and cause gas leaks. *Adams*, 211 Ill. 2d at 44. In holding that the supplier was under such a duty, the court reasoned that gas was a dangerous substance when not under control and that gas suppliers can be held liable for negligence in permitting gas to escape. *Adams*, 211 Ill. 2d at 45. The court further reasoned that the defendant had superior knowledge of the risks the connectors posed and knew that the sulfur in the gas it supplied contributed to the connectors' corrosion. *Adams*, 211 Ill. 2d at 52-54. The court agreed with the following statement from a Colorado case involving a gas supplier: " 'When a party can reasonably foresee that its product will be used as an integral component of a defective and unreasonably dangerous product, there is a duty upon that party to undertake corrective action to alleviate, if possible, the hazard.' " *Adams*, 211 Ill. 2d at 53 (quoting *Halliburton v. Public Service Co. of Colorado*, 804 P.2d 213, 216 (Colo. App. 1990)).

¶ 121    Plaintiff has not articulated any reason why *Adams* should be extended to this case. ITW is not the supplier of a dangerous substance like natural gas. Plaintiff simply asserts that, "[a]pplying *Adams* to the case at hand, ample facts exist that ITW knew of the hazard and should have taken steps to alleviate the hazard." He cites no case, other than *Adams*, to support his assertion that ITW's knowledge of the allegedly dangerous condition of Western's machines would give rise to a duty. Because plaintiff has not articulated any reason why *Adams* should be extended beyond the natural-gas context, we decline to extend it here. See *Wright v. Board of Education of the City of Chicago*, 335 Ill. App. 3d 948, 957 (2002) (declining to extend a case involving a gas supplier outside of that context).

¶ 122                                    III. CONCLUSION

¶ 123         For the foregoing reasons, we reverse the judgment of the circuit court of Du Page County and remand for further proceedings.

¶ 124         Reversed and remanded.

¶ 125         JUSTICE BURKE, dissenting.

¶ 126         The evidence presented at summary judgment in this case does not raise a genuine issue of material fact as to whether Western and ITW were engaged in a joint venture. I agree with the trial court that the "easiest element to analyze [was] whether there was a sharing of profits and losses."

¶ 127         What is described by the majority as the sharing of profits and losses based on the sharing of the same revenue stream–and the increase or decrease in revenue based on the increase or decrease in sales volume–would apply to any relationship between entirely independent companies engaged in the manufacture and distribution of a product. To characterize all such relationships as joint ventures would lead to absurd results. Any profits accruing from the movement of a product from the manufacturer to the processor and then to the ultimate consumer cannot be said to be a sharing of the profits of the processor, otherwise every firm that furnishes materials in connection with an enterprise might be termed a joint venturer whether or not it had such intent. See *Wells v. Whitaker*, 151 S.E.2d 422, 431 (Va. 1966).

¶ 128         The majority cites *Herst v. Chark*, 219 Ill. App. 3d 690 (1991), as authority for the proposition that, where parties divide a manufacturing operation along functional lines and divide the revenues and expenses along those lines, there is an issue as to whether they are sharing in profits and losses. Although the *Herst* court cited the division of the business, and the revenues and the expenses, along functional lines, it is unclear whether the court linked that division to a factor other than the sharing of profits and losses. Regardless, *Herst* is readily distinguishable from this case on that factor.

¶ 129         In *Herst*, the court held that the parties shared profits and losses, relying on the parties' creation and use of a jointly-owned account for handling the finances of the enterprise. There also was evidence that the parties actually shared profits and losses related to the clients who were serviced through the parties' program. *Herst*, 219 Ill. App. 3d at 695-96.

¶ 130         Here, there is no evidence of a joint account and no evidence of the sharing of either company's profits or losses. In fact, Don Edelstein of Western specifically testified that his company and ITW did not share profits.

¶ 131         The majority points out areas where Western and ITW agreed to share in certain costs and in savings from cost improvements. I agree with the trial court that, although cost improvements–and costs, for that matter–might impact profits and losses, such cost improvements are not profits and losses themselves. In *Coburn Supply Co. v. Kohler Co.*, 194 F. Supp. 2d 580, 582 (E.D. Tex. 2002), the court held that the defendant's agreement to share in the costs of promoting its products sold through the plaintiff was not synonymous with the sharing of losses. Likewise, the sharing of cost improvements is not synonymous with the sharing of profits. See *Vern Shutte & Sons v. Broadbent*, 473 P.2d 885, 886 (Utah

1970) (" '[I]t is not enough that the parties act in concert to achieve some economic objective. The ultimate inquiry is whether the parties manifested by their conduct a desire to commingle their profits, control, and risks in achieving the objective.' " (quoting *Hayes v. Killinger*, 385 P.2d 747, 754 (Or. 1963))).

¶ 132    This case is similar to *Kaporovskiy v. Grecian Delight Foods, Inc.*, 338 Ill. App. 3d 206 (2003), where the appellate court considered whether Grecian Delight had entered into a joint venture with Motorsport Marketing, where Motorsport would exclusively promote Grecian Delight's food products at various racing events. Determining that there was no sharing of profits and losses, the court stated, "[t]here is nothing in the record that indicates that Grecian Delight would share in any losses Motorsport suffered if the food did not sell. Nor is there anything in the record that indicates that Motorsport shared any profits it gained in selling the food products." *Kaporovskiy*, 338 Ill. App. 3d at 213.

¶ 133    Like in *Kaporovskiy*, nothing in the present case shows that Western would share in ITW's losses if the plastic products sat in a warehouse and did not sell. Similarly, although Western and ITW each anticipated profiting from their relationship, there is nothing to show that ITW shared with Western any profits it realized from the sale of the products. Thus, under the undisputed facts presented, there was no sharing of profits and losses between ITW and Western. See *Vern Schutte*, 473 P.2d at 886 (for the creation of a joint venture, the profit accruing must be joint and not several); see also *Inter-City Tire & Auto Center, Inc. v. Uniroyal, Inc.*, 701 F. Supp. 1120, 1126 (D.N.J. 1988) ("[t]he anticipation of separate profits for each party does not amount to an intention to share profits").

¶ 134    In the absence of sharing of profits and losses, no joint venture exists. *O'Brien v. Cacciatore*, 227 Ill. App. 3d 836, 843 (1992). Therefore, the relationship between Western and ITW was not a joint venture. Because I agree with the majority's analysis on plaintiff's contentions concerning ITW's right to control and knowledge of the unreasonably dangerous machine, I would affirm the trial court's order granting ITW's motion for summary judgment.

¶ 135    I am also concerned by the majority's treatment of the workers' compensation issue. The majority states, "[w]e agree with plaintiff that it was error for the trial court to raise this issue *sua sponte*." *Supra* ¶ 105. The majority then elaborates that the *sua sponte* nature of the ruling prejudiced plaintiff and failed to hold ITW to its tactical decisions. While the legal analysis on this point is quite sound, the problem is that plaintiff never argued this issue.

¶ 136    Plaintiff noted in his briefs that the trial court raised the workers' compensation issue *sua sponte*, but he never argued that he was prejudiced or that the ruling must be limited to those issues raised by ITW in its pleadings. Plaintiff simply argues the merits of whether ITW was immune under the Workers' Compensation Act if it was engaged in a joint venture with Western.

¶ 137    Plaintiff was certainly free to argue, both in a motion to reconsider in the trial court and on appeal, that he was prejudiced by the trial court's *sua sponte* ruling and that the trial court erred in considering an issue that ITW chose not to raise. Plaintiff did neither. The majority notes that a trial judge may not be an advocate for a party, but it does exactly that by raising an issue and making arguments that plaintiff has never articulated.

¶ 138    Since the majority has determined that there is a genuine issue of material fact regarding whether ITW and Western were engaged in a joint venture, I believe that the majority should address the merits of the workers' compensation issue as framed by the parties on appeal.