NOTICE
Decision filed 11/28/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220445-U

NO. 5-22-0445

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* ADOPTION OF A.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (Dawn Sigler and Robert Copeland, | ) | Macon County. |
| | ) | |
| Petitioners-Appellees, | ) | |
| v. | ) | No. 21-AD-54 |
| | ) | |
| Richard Mares, | ) | Honorable |
| | ) | Thomas E. Little, |
| Intervenor and Counterpetitioner-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court had jurisdiction to consider grandfather's counterpetition for adoption. The circuit court's decision to grant the foster parents' petition for adoption and deny grandfather's counterpetition was not against the manifest weight of the evidence.

¶ 2    Richard Mares, A.C.'s maternal grandfather, appeals the judgment of the circuit court of Macon County denying his counterpetition for adoption while granting the foster parents' adoption petition. He argues that granting his petition was in A.C.'s best interest. The foster parents argue that the counterpetition was insufficient and deprived the circuit court of jurisdiction.  We affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4    A.C. was born on September 29, 2015, to her biological parents, Jessica Mares and T.J. Clifton. A.C. was exposed to opiates during the pregnancy and experienced withdrawal symptoms at birth. Jessica and T.J. were respondents in a Macon County, juvenile proceeding. See *In re A.C.*, No. 19-JA-224 (Cir. Ct. Macon County). A.C. and her brother were removed from her parents' care and placed in protective custody with a relative. On February 16, 2020, A.C. was transferred to traditional foster care with Dawn Sigler and Robert Copeland (collectively, foster parents). On March 1, 2021, Jessica and T.J. surrendered their parental rights to A.C. after Jessica became pregnant. The Guardianship Administrator of the Illinois Department of Children and Family Services (DCFS) was appointed as the guardian of A.C. with authority to consent to adoption. See *In re A.C.*, No. 19-JA-224 (Cir. Ct. Macon County).

¶ 5    On August 17, 2021, the foster parents filed a petition to adopt A.C. The petition was filed with the consent of DCFS. Upon the filing of the petition, the circuit court appointed Kathleen Pletsch as the guardian *ad litem* (GAL). On August 31, 2021, Richard Mares (Grandfather), A.C.'s maternal grandfather, filed a petition to intervene in the adoption proceeding filed by the foster parents. Grandfather's petition to intervene asserted that he was related to A.C. and was allowed to file a petition to adopt prior to the entry of a judgment of adoption. The foster parents filed an objection to the motion to intervene and argued that Grandfather had previously declined the opportunity to care for A.C. and A.C. had bonded with her foster parents. The circuit court granted the petition to intervene over the foster parents' objection. Subsequently, Grandfather filed a counterpetition for the

adoption of A.C. The foster parents did not address the sufficiency of Grandfather's counterpetition or claim noncompliance with the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)) before the circuit court.

¶ 6                    A. DCFS Investigation Report for Adoption

¶ 7    DCFS filed an investigation report for adoption on October 12, 2021. The report included background information on the foster parents and did not include information on Grandfather. According to the DFCS report, the foster parents, Dawn and Robert, were married, and lived with Dawn's 16-year-old adopted son. Dawn was a homemaker and previously employed as a home health aide coordinator and daycare aide. The report revealed that Dawn had been prescribed medication for anxiety and depression, and she was a smoker. Robert was employed full time as a lead operator. He was in good health but was also a smoker and had a history of alcohol abuse.

¶ 8    The DCFS report included Dawn and Robert's criminal histories. Dawn had been arrested in 2003 and found guilty of deceptive practice for writing a bad check. Robert had multiple DUIs and convictions for driving on a suspended license. He had served time in county jail. In 2004, Robert was arrested for trespass to a residence and domestic battery. He was sentenced to 18 months of supervision and the case was dismissed. Robert reported that he no longer drinks.

¶ 9    The report indicated that the foster parents have strong parenting skills, and they advocate for A.C.'s best interests. They have sufficient income, and their home exceeds the foster care licensing standards. A.C. has her own bedroom, age-appropriate toys, and appropriate clothing for her age and size. Additionally, A.C. has bonded with her foster

3

family. DCFS recommended that the foster parents adopt A.C. Along with the adoption report, DCFS, through its Guardianship Administrator, which had the right and authority to consent to the adoption, filed a consent form for the foster parents to adopt A.C.

¶ 10                           B. GAL Report – March 23, 2022

¶ 11    The GAL filed a report on March 23, 2022. The GAL report included a similar background and criminal history for the foster parents as set forth in the DCFS report. The GAL report also included Grandfather's background. He had been convicted of possession of a controlled or counterfeit substance in Macon County. See *People v. Mares*, No. 97-CF-1493 (Cir. Ct. Macon County, Mar. 3, 1998). Grandfather also had been convicted of violating an order of protection. See *People v. Mares*, No. 15-CF-559 (Cir. Ct. Macon County, Sept. 15, 2015).

¶ 12    The report further revealed that on September 1, 2021, the GAL spoke with A.C., who was five years old at the time. A.C. enjoyed school, playing outside, dancing, getting her makeup and nails done with Dawn, and riding bikes with Robert. A.C. told the GAL that she was excited about the adoption.

¶ 13    The GAL had also contacted Jacqueline Danneberger, the petitioner in the order of protection case against Grandfather. The GAL learned that Jacqueline had filed a petition for an order of protection because Grandfather was "overly persistent" in trying to remain in a relationship that had ended after five years. Grandfather continued to contact Jacqueline after the plenary order was granted, resulting in Grandfather's conviction for violating an order of protection. Jacqueline, however, subsequently dismissed the order of

4

protection and became friends with Grandfather. She did not believe that Grandfather was a dangerous person, and she supported him in the adoption process.

¶ 14 The GAL report also indicated that Grandfather had indicated he wanted to care for A.C. before she was placed with the foster parents. A.C. had a brother that was diagnosed with cerebral palsy. Grandfather was concerned about whether he would be able to properly care for his grandson, who had substantial medical issues. DCFS only gave Grandfather the option to care for both children.

¶ 15 The report further indicated that Grandfather was concerned about A.C.'s placement with the foster parents because he believed that Dawn abused drugs. Grandfather informed the GAL that a school employee had reported Dawn to DCFS after Dawn appeared to be intoxicated in the school parking lot with A.C. The GAL could not locate the DCFS report. When asked about the incident, Dawn informed the GAL that she was not intoxicated when she dropped A.C. off at school. Dawn indicated she had recently purchased a van and had a difficult time opening the sliding door. A week after the incident, Dawn submitted to a drug test, and the results were negative. DCFS determined that the complaint was unfounded. Grandfather also informed the GAL that he had reported Dawn to DCFS because he believed that Dawn was abusing drugs. The allegation of drug use was based on messages between Dawn and A.C.'s natural mother, Jessica. The GAL had spoken to Jessica and viewed the messages on her phone. From the GAL's perspective, it appeared that Dawn had purchased drugs from A.C.'s biological parents, Jessica and T.J. Dawn denied purchasing and using illegal drugs. The GAL believed the messages posed a legitimate concern and suggested that testimony regarding the allegations was necessary.

¶ 16    The GAL was unable to make an adoption recommendation in her initial report. She did not want to disrupt the continued care of A.C. by the foster parents. However, if the allegations of drug use by Dawn were proven as true, then the GAL would support Grandfather's adoption of A.C. On the other hand, if the claims were unfounded, then the GAL believed that an adoption by the foster parents would be in A.C.'s best interest.

¶ 17                              C. Hearing on Adoption Petitions

¶ 18    The hearing on the adoption petitions began on March 25, 2022. The foster parents proceeded first. Dawn was the opening witness. She testified that she had been a licensed foster parent for approximately 17 years. She began fostering A.C. and A.C.'s brother in February of 2020. A.C.'s brother had cerebral palsy, required extensive care, and was frequently hospitalized. The foster parents requested that both children be removed from their care because during the COVID-19 pandemic Dawn struggled to care for her own son and A.C. when A.C.'s brother was hospitalized. COVID-19 limited social interactions which made it difficult for anyone to help Dawn and she began to suffer from heart palpitations and panic attacks. Three weeks after the children were removed, however, A.C. returned to the foster parents' care. A.C.'s brother did not return with A.C. Since that time, A.C. had been in continuous care with the foster parents. Dawn testified that although A.C.'s brother did not return to her care, she continued to facilitate the relationship between A.C. and her brother, and intended to continue to do so after A.C. was adopted. During the COVID-19 pandemic, Dawn also assisted A.C. to interact with her mother, Jessica, through video conference visitation and phone calls before Jessica surrendered her parental rights.

Dawn testified that she had always supported Jessica and A.C.'s relationship when Jessica was sober.

¶ 19   Dawn stated that she was in good health. She had undergone gastric bypass surgery eight years previously and had a history of issues with ulcers which caused her to occasionally vomit blood when she had a flare-up. Dawn was also prescribed Wellbutrin. She testified that she seldom drinks alcohol.

¶ 20   Dawn believed that A.C. had bonded with her foster family. A.C. and Dawn's adopted son act like brother and sister. A.C. adores Dawn's husband, Robert, and they frequently play together. A.C. would write letters to her foster parents that say, "I love you, mom and dad" and often told them, "I love you so very, very, very much." Dawn also testified that A.C. was doing well in school. A.C. was not aware of the adoption proceedings.

¶ 21   Dawn also testified to Grandfather's interactions with A.C. He had helped watch A.C. on some weekends. Dawn did not have any issues with Grandfather until she found out that he had taken A.C. in the company of Jacqueline, the person who had an order of protection against him. The last time that Grandfather spent time with A.C. was approximately a year prior to the hearing.

¶ 22   Robert testified after Dawn. He was employed as a lead operator for a medical waste disposal service. He explained that Dawn was a stay-at-home home mother because he made enough money for their family. Robert would walk A.C. to and from school, which was located three blocks from their house. He no longer had a driver's license due to his history with DUIs. He had refrained from consuming alcohol for more than five years.

¶ 23 Kimberly Wade, an adoption specialist with the Center for Youth and Family Solutions, testified that it was in A.C.'s best interests to grant the foster parents' adoption petition. She believed that it would be detrimental for A.C.'s well-being if she were removed from their care. Kimberly had never observed the foster parents at their home due to COVID-19; however, she conducted multiple video conferences. Kimberly had never met Grandfather and had no personal information regarding him. After Kimberly's testimony concluded, the foster parents rested their case.

¶ 24 Grandfather began his case by calling as his first witness, Jessica Mares, Grandfather's daughter and A.C.'s biological mother. She testified regarding the drug use by Dawn. Jessica indicated she would communicate with Dawn through text messaging or through Facebook messenger. Jessica described a conversation that she had with Dawn through Facebook messenger on May 1, 2021, where Dawn had asked Jessica to call Dawn. Jessica texted back, "T.J. said 15 of them for 300 5 dollara [*sic*] off every bag said meet him in moara arounf [*sic*] 7." Jessica testified that "bags" referred to marijuana. Jessica further stated that she and T.J. met with Dawn at a Walmart in Decatur, Illinois, and T.J. sold Dawn marijuana.

¶ 25 Dawn also messaged Jessica on May 18, 2021, and said, "have [T.J.] give you that bag if he still has it." Dawn additionally messaged, "I'm in so much pain I feel horrible." Jessica suggested that Dawn meet T.J. at Walmart again and Dawn declined. Jessica then offered to bring the bag to Dawn's house and requested Dawn's address. Dawn responded with "111 South Miller." Jessica testified that this address was Dawn's house and that she

had been to her house in the past. According to Jessica, Dawn purchased marijuana from T.J. that same evening.

¶ 26   Jessica sent Dawn a message on June 8, 2021, that said, "I can get 10 of those bars for you he wants $8 a piece. He could probably get more than 10 if you want." Jessica testified that the text meant that T.J. would sell Dawn "bars" of Xanax. Dawn responded that she wanted 10. Dawn had moved and messaged that her new address was "520 e main st." Jessica had been to Dawn's new house, and she believed that was her current address. Jessica testified that she was present when Dawn purchased Xanax from T.J. on June 8, 2021. She believed that Robert was home, but he was not involved in the transaction.

¶ 27   Jessica additionally testified that, on occasion, Dawn had appeared to be "under the influence," as she had appeared "a little out of it." A.C. had been removed from Jessica and T.J.'s care due to drug-related issues. Jessica explained that she never reported Dawn's purported substance abuse issues because Jessica wanted to continue seeing A.C. and did not want the issues to negatively impact her relationship with A.C. According to Jessica, Grandfather did not have substance abuse issues.

¶ 28   During cross-examination, Jessica was questioned about her criminal record. Jessica admitted to having been convicted of several felony offenses. She was on probation at the time of the hearing. Jessica had given birth to a son while the juvenile case was pending, and her baby was also removed from her care. Jessica had messaged Dawn on January 4, 2022, that she vowed to get back at Dawn for having her baby taken away.

¶ 29   T.J. Clifton testified next about selling drugs to Dawn. T.J. had met with Dawn in the early summer of 2021. He recalled selling marijuana and pills to Dawn at a McDonald's

9

in Clinton, Illinois. He believed that he was only involved in that one transaction. He then testified that he had met with Dawn at a Walmart in Decatur, Illinois, but that Dawn had not purchased anything from him at that time. T.J. testified that he had prior convictions for drug-related issues and had been under the influence of drugs during his interactions with Dawn.

¶ 30    On cross-examination, T.J. admitted to several criminal convictions. He believed that he was using marijuana and cocaine when he met with Dawn. He could not recall what had happened but remembered that he had "met her at Walmart and at McDonald's and sold her drugs."

¶ 31    Grandfather next called Dawn as a witness and questioned her about the substance abuse allegations. First, she was questioned about appearing intoxicated at A.C.'s school, resulting in a report to DCFS. Dawn explained that a teacher's assistant reported Dawn to DCFS because Dawn had a difficult time opening the sliding door to her van. Dawn had bronchitis and was not feeling well. The van was new, the child lock was on, and Dawn was unable to exit the van at school because of COVID-19 restrictions. DCFS investigated the incident and Dawn agreed to take a drug test. The results of the test were negative.

¶ 32    Dawn was also questioned about messaging Jessica. Dawn admitted that in May of 2021, she had messaged Jessica, "You up? Let me know if you are. I'm struggling for answers. Thought you could help?" Dawn stated that she sent the message because "[A.C.] had been expressing some big feelings, and I was trying to navigate them." Dawn was asked about the message from Jessica that read, "T.J. said 15 of them for 300 5 dollara [*sic*]

off every bag said meet him in moara arounf [*sic*] 7." Dawn stated that she did not know about the message, and she did not meet Jessica and T.J. in Maroa, Illinois.

¶ 33    Dawn next testified to the messages sent on May 18, 2021. Dawn admitted that she had messaged Jessica to ask T.J to give Jessica the "bag," if he still had it. Dawn explained that the "bag" was not a drug reference. Jessica had been to Dawn's house and took a bag which contained nausea medication.

¶ 34    Dawn denied responding to a message from Jessica that said, "I can get 10 of those bars for you he wants $8 a piece. He could probably get more than 10 if you want." Dawn stated that she did not see that message until six weeks after it happened. She had discovered the message when she was looking for a photo of A.C. that Jessica had sent to her through Facebook messenger. Dawn also stated the second address sent to Jessica was incorrect. Dawn believed that someone had used her phone to send the messages. She explained that her friend, Renee Delaney, and Jessica would frequently use her phone. The court then ended testimony for the day.

¶ 35    The hearing resumed on April 28, 2022. Testimony began with Jacqueline Danneberger. Jacqueline had filed for an order of protection against Grandfather on August 26, 2014. See *Danneberger v. Mares*, No. 14-OP-501 (Cir. Ct. Macon County, Aug. 26, 2014). Jacqueline testified that she sought an order of protection because Grandfather continued to contact her through email, text, and phone calls after their relationship ended. The plenary order was entered, and Grandfather continued to contact her, resulting in Grandfather's conviction for violating the order of protection. Jacqueline later decided to contact Grandfather and she dismissed the order of protection before its expiration.

11

Jacqueline testified that Grandfather was a "good-hearted person," and they became friends. According to Jacqueline, Grandfather had not visited A.C. in over a year.

¶ 36　Grandfather then testified. He stated that he was 59 years old and in good health. He was employed for 31 years with a company that builds hotels. He was financially able to care for A.C. and would be able to add A.C. to his company's health insurance plan if his petition was granted. He testified about his plan for A.C. to attend school while in his care. A.C.'s aunt lived two blocks from his apartment. A.C. would be able to ride the school bus with her cousins. His work schedule allowed him to care for A.C. after school. He also testified that he would encourage A.C. to maintain a relationship with her siblings. Grandfather was concerned that Dawn would not allow extended family to contact A.C. if their adoption petition was granted.

¶ 37　Grandfather provided testimony on A.C.'s placement with a foster family. When A.C. was removed from her parents, Grandfather was working out-of-state. A.C. was initially placed with Grandfather's ex-wife's sister. He had helped her with bills and had purchased appliances while she cared for A.C. and her brother. Grandfather was not notified when she stopped caring for the children. He claimed that he was not given the opportunity to care for A.C. Grandfather had made several calls to DCFS and was unable to reach anyone and he did not have the foster parents' contact information. Jaqueline had contact information for a DCFS supervisor, and she assisted Grandfather in requesting visitation. DCFS arranged visitation beginning in September of 2020. After the foster parents had notified DCFS that they were unable to care for both A.C. and her brother, Grandfather requested to care for A.C. Grandfather was unable to provide A.C.'s brother

12

with the necessary day-to-day care needed for his cerebral palsy. DCFS responded that it wanted the children to stay together, and Grandfather was informed that his housing was inadequate. Grandfather rented a larger apartment, but A.C. was returned to the foster parents' care before he finalized his move. Grandfather testified that he was still renting the larger space and had a bedroom for A.C.

¶ 38    Grandfather had called the DCFS hotline after discovering that the children were separated and DCFS did not place A.C. in his care. He did not trust Dawn and thought she was "flighty." In his complaint to DCFS, he stated that Dawn had the physical appearance of someone that was abusing drugs. Grandfather was also concerned with Dawn smoking around A.C.

¶ 39    Grandfather visited A.C. every other weekend after she returned to Dawn's care until July of 2021. In July of 2021, Dawn had asked him to watch A.C. so that she could prepare the house for new foster children. A.C. stayed the night with Grandfather. Dawn stopped allowing visitation after that weekend. Grandfather believed that Dawn ended visitation because he had filed a counterpetition for adoption.

¶ 40    Grandfather then testified about the order of protection. He explained that he had "tried too much" to continue his relationship with Jacqueline. He had learned that "you need to listen when they tell [you] they don't want to talk to you."

¶ 41    After Grandfather's testimony concluded, Dawn resumed her testimony about substance abuse allegations. She testified that her friend, Renee Delaney, would stay at her house on occasion, and Renee had access to Dawn's phone. On July 28, 2021, Dawn confronted Renee about her use of Dawn's phone, which upset Renee. Renee passed away

on October 13, 2021. Dawn denied purchasing drugs from T.J. and Jessica. Dawn additionally testified that she never interfered with Grandfather's relationship with A.C. and she had invited him to spend Christmas and Easter with A.C.

¶ 42 On cross-examination, Dawn was further questioned about the messages to Jessica. Dawn admitted to sending a message about the "bag" because Jessica mistakenly took Dawn's prescription medication after a visit. Dawn had requested that T.J. "bring the bag with my stuff in it," and the message had nothing to do with purchasing illegal drugs. Dawn denied responding to the Facebook message that referred to Xanax bars and marijuana. She explained that she had a "huge fight" with Renee when she confronted her about the messages. Dawn could not verify that her friend sent messages from Dawn's phone. Dawn testified that her "phone is always out" and "it is always open." Dawn also admitted that she told Jessica that "no one" would be allowed to visit A.C., but she did not specifically withhold visitation from Grandfather.

¶ 43 The hearing concluded after Dawn finished her testimony. The court allowed the GAL to file a recommendation within 14 days. The parties were given an additional 14 days to submit written closing statements after the GAL report was filed.

¶ 44 D. GAL Report – May 12, 2022

¶ 45 On May 12, 2022, the GAL filed a second report which included references to testimony from the hearing. The report discussed the exchange of messages between Jessica and Dawn. Jessica and Dawn gave conflicting testimony regarding the use of "bag" in the messages. The GAL believed that the messages lacked context, and in her opinion, Jessica's testimony was not enough to support the inference that Dawn had purchased

marijuana. The GAL opined that Jessica was "biased and motivated by her own interests." No additional evidence was presented that supported Jessica's claim that Dawn purchased drugs.

¶ 46 The GAL also considered T.J.'s testimony regarding the sale of illicit drugs to Dawn. His testimony of the dates and locations of the alleged drug sales differed from Jessica's testimony. He had also testified that he was a habitual drug user, which affected his memory. In the GAL's opinion, T.J.'s testimony was "inconsistent, lacked clarity, and was altogether unconvincing."

¶ 47 The GAL report also addressed the incident where a teacher's assistant reported Dawn to DCFS for appearing to be "under the influence." In response to the allegation, Dawn took a drug test, and the result was negative. The GAL considered that DCFS allowed A.C. and other foster children to remain in Dawn's care after investigating the allegation made by the teacher's assistant.

¶ 48 The GAL recommended that it was in A.C.'s best interests for the court to grant the foster parents' adoption petition. She believed the testimony regarding Dawn purchasing and abusing illegal substances was vague and unreliable. A.C. was doing well in school and was well adjusted to living with her foster parents. A.C. relied on them as parents. The foster parents had appropriate housing and were financially able to care for A.C. The GAL was concerned that granting Grandfather's petition would interrupt the continuity of care that A.C. had received from the foster parents since she was very young.

¶ 49                          E. Closing Arguments

¶ 50    Dawn and Robert submitted a closing argument requesting that the court grant their petition to adopt A.C. They argued that the DCFS investigation report did not address any concerns with A.C.'s home environment. A.C. had bonded with her foster family. The foster parents showed love and concern for A.C. and A.C. interacted well with their son. Robert was financially able to provide for the family, while Dawn was able to be present when A.C. returned home from school. The foster parents argued that the court should grant their petition to adopt A.C. in accordance with the DCFS recommendation and the recommendation of the GAL.

¶ 51    Grandfather argued in his closing argument that Dawn had issues with illicit drug use which affected A.C.'s safety and well-being. He argued that the messages between Dawn and Jessica demonstrated that Dawn had issues with substance abuse. A school employee made a hotline report based on her belief that Dawn was "under the influence." Additionally, Grandfather had made a hotline call to DCFS due to his concerns regarding Dawn. He additionally argued that the foster parents were both smokers and A.C. had allergies. Dawn suffered from anxiety and depression, and she had testified that she vomited blood regularly. Robert has a history of DUIs and no driver's license. In comparison, Grandfather had no health concerns and did not smoke.

¶ 52    Grandfather additionally argued that he had been in A.C.'s life since she was born, and he remained in A.C.'s life when she was removed from her parents' care. Grandfather loved A.C. and A.C. loved him. He argued that granting his adoption petition would not interfere with her school since she was only in kindergarten. Grandfather lived near a

school and had family members that would attend school with A.C. The circuit court should consider the value of preserving family ties. The foster parents were not related to A.C. Grandfather, on the other hand, would facilitate a relationship between A.C. and her cousins, as well as her brothers. He was financially secure, as he remained in the same employment for 31 years. Grandfather argued that an investigation into his background was not necessary under the Adoption Act because he was related to A.C. He acknowledged that he was convicted of violating an order of protection, but he had become friends with the person who had filed for the order of protection. Grandfather further argued that the court should not rely on the DCFS report because it was incomplete. The report did not include the information that the foster parents had requested that A.C. be removed from their care, and failed to include any information on Grandfather. He requested that the court grant his counterpetition for adoption and deny the petition filed by the foster parents.

¶ 53                                  F. Judgment

¶ 54    The court entered a memorandum opinion on June 22, 2022, followed by a judgment of adoption on June 24, 2022. The court considered the testimony of each witness, the messages, and reports. The court determined that Jessica and T.J.'s testimony was not credible. The court found that it was in A.C.'s best interest to be adopted by the foster parents because they provided A.C. with a sense of security, familiarity, and continuity. The court believed that Grandfather loved A.C., and he was concerned for her well-being. However, the court found that removing A.C. from the foster parents would be disruptive

17

and not in A.C.'s best interest. The court granted the foster parents' petition for adoption and denied Grandfather's counterpetition. This appeal follows.

¶ 55                                    II. ANALYSIS

¶ 56    On appeal, Grandfather argues that the circuit court's decision to deny his counterpetition for adoption was against the manifest weight of the evidence. He asserts that it was in A.C.'s best interests to grant his counterpetition for adoption and deny the foster parents' adoption petition.

¶ 57    The foster parents claim that the court was deprived of jurisdiction to consider Grandfather's counterpetition for adoption because he had not alleged consent by DCFS. They also argue that Grandfather was not entitled to adopt A.C. because he had not complied with an investigation requirement under the Adoption Act (750 ILCS 50/6 (West 2020)). The legal question of whether the circuit court has jurisdiction is reviewed *de novo*. *In re Luis R.*, 239 Ill. 2d 295, 299 (2010).

¶ 58    We first consider the foster parents' argument that the circuit court was without jurisdiction to grant Grandfather's counterpetition for adoption. Despite procedural failures, the circuit court has subject matter jurisdiction to hear and determine "a justiciable matter to which the court's constitutionally granted original jurisdiction extends." (Internal quotation marks omitted.) *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 841 (2010). A "justiciable matter" is "a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 335 (2002).

18

¶ 59    Strict statutory compliance with statutory requirements is not necessary for circuit court jurisdiction. *In re Marriage of Bussey*, 128 Ill. App. 3d 730, 733 (1984). Procedural failures which could have been corrected if raised in the circuit court do not go to the question of jurisdiction and cannot be raised for the first time on appeal. *Bussey*, 128 Ill. App. 3d at 733.

¶ 60    A petition to adopt a child other than a related child shall state specific information as required by section 5(B) of the Adoption Act, including:

> "That the person or agency, having authority to consent under Section 8 of this Act, has consented, or has indicated willingness to consent, to the adoption of the child by the petitioners, or that the person having authority to consent is an unfit person and the ground therefor, or that no consent is required under paragraph (f) of Section 8 of this Act[.]" 750 ILCS 50/5(B)(j) (West 2020).

This requirement under section (B)(j) is not required in a petition to adopt a related child. 750 ILCS 50/5(C) (West 2020). A petition to adopt a related child does not need to include an allegation that the petitioner has custody or that DCFS has consented to the adoption. *In re J.D.*, 317 Ill. App. 3d 419, 425 (2000).

¶ 61    A "related child" is defined as:

> "a child subject to adoption where either or both of the adopting parents stands in any of the following relationships to the child by blood, marriage, adoption, or civil union: parent, grand-parent, great-grandparent, brother, sister, step-parent, step-grandparent, step-brother, step-sister, uncle, aunt, great-uncle, great-aunt, first cousin, or second cousin." 750 ILCS 50/1(B) (West 2020).

A child's grandparent is related to the child. *In re Adoption of Ruiz*, 164 Ill. App. 3d 1036, 1039 (1987).

19

¶ 62    Grandfather alleged in his petition that he was the maternal grandfather of A.C. His petition complied with the requirements to adopt a related child. Grandfather's counterpetition to adopt A.C. alleged a justiciable matter giving the circuit court jurisdiction.

¶ 63    The foster parents additionally argue for the first time on appeal that Grandfather failed to comply with the requirements of the Adoption Act (750 ILCS 50/6 (West 2020)) where DCFS did not complete an investigation of Grandfather. However, an investigation is not required "when the petition seeks to adopt a related child." 750 ILCS 50/6(D) (West 2020). Although an appellee is not as limited in the scope of review as an appellant, review cannot go beyond the issues appearing in the record. *Hiatt v. Western Plastics, Inc.*, 2014 IL App (2d) 140178, ¶ 107. An issue raised on appeal by an appellee "must at least be commensurate with the issues presented at trial." *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 509 (1988). The foster parents did not challenge the sufficiency of Grandfather's counterpetition or his relationship to A.C. before the circuit court. The circuit court permitted Grandfather's motion to intervene and allowed the filing of a counterpetition for a related adoption. The foster parents cannot now change their theory on review.

¶ 64    We next consider the merits of the competing petitions to adopt A.C. The circuit court's findings in an adoption proceeding will not be disturbed on review unless its decision was against the manifest weight of the evidence. *Nees v. Doan*, 185 Ill. App. 3d 122 (1989). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or

not based on evidence." (Internal quotation marks omitted.) *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23.

¶ 65 The court has sole discretion over the final determination of the propriety of the adoption. 750 ILCS 50/15.1 (West 2020). "When the trial court reviews facts in making its final determination, the welfare of the child should be the prime consideration in all adoption proceedings." *Stines v. Vaughn*, 23 Ill. App. 3d 511, 519 (1974). The court shall consider all relevant factors including, but not limited to:

> "(1) the wishes of the child;
> (2) the interaction and interrelationship of the child with the applicant to adopt the child;
> (3) the child's need for stability and continuity of relationship with parent figures;
> (4) the wishes of the child's parent as expressed in writing prior to that parent's execution of a consent or surrender for adoption;
> (5) the child's adjustment to his present home, school and community;
> (6) the mental and physical health of all individuals involved;
> (7) the family ties between the child and the applicant to adopt the child and the value of preserving family ties between the child and the child's relatives, including siblings;
> (8) the background, age and living arrangements of the applicant to adopt the child;
> (9) the criminal background check report presented to the court as part of the investigation required under Section 6 of this Act." 750 ILCS 50/15.1(b) (West 2020).

No factor is assigned a greater weight than any other factor. *In re Adoption of C.D.*, 313 Ill. App. 3d 301, 309 (2000).

¶ 66 In this case, the circuit court considered the statutory factors, witness testimony, exhibits, arguments by counsel, and the reports filed by the GAL and DCFS in reaching its decision in favor of the foster parents. The circuit court in its memorandum opinion summarized the testimony received from the parties and their witnesses, including the

21

foster parents, A.C.'s biological parents, Jessica and T.J., Jacqueline Danneberger, and Kimberly Wade, an employee with the Center for Youth and Family Solutions.

¶ 67     The circuit court was in the best position to assess the credibility of the evidence and witness testimony. *C.D.*, 313 Ill. App. 3d at 308. Great deference is given to the circuit court in making credibility determinations and we will not substitute our judgment for the circuit court's. *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 70. The circuit court addressed the substance abuse allegations made against Dawn and found that Dawn was a credible witness. The circuit court found that Jessica and T.J. were not credible witnesses.

¶ 68     The foster parents had cared for A.C. since February 2020. A.C. relied on her foster parents as parent figures and had developed a significant emotional attachment. A.C. was performing well in school and she was well-adjusted with her foster family. The foster parents had shown a willingness to maintain a familial relationship between A.C. and her brothers. The court noted that Dawn had encouraged contact between A.C. and Jessica when Jessica was sober. Robert was able to provide financial security for the family and Dawn was able to stay at home and care for A.C.

¶ 69     The court also found that Grandfather loved A.C., and that his testimony was credible. He was A.C.'s maternal grandfather and he would preserve family ties. A.C.'s aunt would be able to assist Grandfather and help A.C. take the bus to school with her cousins. He had stable employment and health insurance. The court considered that Grandfather had spent time with A.C. on weekends and holidays before she was removed from her parents' care. He had also tried to care for A.C. when Dawn had given notice to DCFS that she could no longer care for A.C. and her brother. DCFS, however, returned

22

A.C. to the care of the foster parents. Grandfather had only visited with A.C. approximately eight times in 2½ years.

¶ 70    The memorandum opinion also included a summary of the DCFS and GAL reports. DCFS and the GAL both reported that A.C.'s placement with her foster family was stable and that her removal from their care would be detrimental to A.C.'s best interests. When weighing the statutory factors, the circuit court determined that it was in A.C.'s best interest to avoid the detrimental effects of removing her from her placement with the foster parents.

¶ 71    Sufficient evidence was presented for the circuit court to determine that granting the foster parents' adoption petition was in A.C.'s best interest. The circuit court's decision to deny Grandfather's counterpetition for adoption was not against the manifest weight of the evidence.

¶ 72                          III. CONCLUSION

¶ 73    For the reasons set forth, we affirm the ruling of the circuit court of Macon County granting the adoption petition in favor of the foster parents and against Grandfather.


¶ 74    Affirmed.